NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210516-U

NO. 4-21-0516

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 7, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 15JA130 |
| v. | ) | |
| Cyliasha H., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's findings respondent was unfit under section 1(D)(m)(ii) of the Adoption Act and it was in the minor child's best interests to terminate respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In August 2019, the State filed a motion for the termination of the parental rights of respondent, Cyliasha H. as to her minor child, I.H. (born in June 2014).  The next month, the State filed a supplemental termination motion.  After a four-day hearing, the Sangamon County circuit court found respondent unfit as alleged in the termination motions.  At a September 2021 hearing, the court found it was in I.H.'s best interests to terminate respondent's parental rights.

¶ 3    Respondent appeals, asserting the circuit court erred by (1) finding her unfit and (2) concluding it was in I.H.'s best interests to terminate respondent's parental rights.  We affirm.

¶ 4    I. BACKGROUND

¶ 5        I.H.'s father is Christyen B., and he is not a party to this appeal. Respondent (born in June 1999) was herself a minor when she gave birth to I.H. On July 27, 2015, the State filed a petition for the adjudication of wardship of I.H. The petition alleged I.H. was neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West Supp. 2015)) because she was not receiving the proper care and supervision necessary for her well-being in that respondent failed to make a proper care plan for I.H. The petition also alleged I.H. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West Supp. 2015)) because her environment was injurious to her welfare as evidence by respondent's domestic violence. At a November 2016 hearing, respondent admitted I.H. was neglected under section 2-3(1)(a) as alleged in the wardship petition, and the circuit court adjudicated I.H. neglected. After a December 2016 hearing, the court entered a dispositional order finding respondent was unfit, unable, or unwilling to care for, protect, train, or discipline I.H. The court made I.H. a ward of the court and appointed the Department of Children and Family Services (DCFS) as I.H.'s guardian and custodian. At that time, respondent was also a ward of the court.

¶ 6        In August 2019, the State filed a motion to terminate respondent's and Christyen's parental rights to I.H. As to respondent, the motion first asserted respondent was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility for I.H.'s welfare. See 750 ILCS 50/1(D)(b) (West 2018). It further asserted respondent failed to make reasonable efforts to correct the conditions that were the basis for I.H.'s removal during any nine-month period after the neglect adjudication and set forth three nine-month periods, specifically November 2, 2016, to August 2, 2017; August 2, 2017, to May 2, 2018; and May 2, 2018, to February 2, 2019. See 750 ILCS 50/1(D)(m)(i) (West 2018). In September 2019, the

- 2 -

State filed a supplemental termination motion, adding the allegation respondent failed to make reasonable progress toward I.H.'s return during any nine-month period after the neglect adjudication and set forth the same three nine-month periods as the reasonable efforts allegation. See 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 7    In September 2020, the circuit court commenced the fitness hearing. The State presented the testimony of (1) Kaeley Bridges, I.H.'s caseworker from June 2016 to December 2017; (2) Robbie Donaldson-Myles, I.H.'s caseworker for December 2017 to March 2019; (3) Tiffany Hampton, a parent educator; and (4) Melanie Verry, I.H.'s caseworker from March 2019 to the time of the fitness hearing. Respondent testified on her own behalf. The evidence relevant to the nine-month period of May 2, 2018, to February 2, 2019, follows.

¶ 8    Donaldson-Myles testified she was I.H.'s caseworker from December 17, 2017, to March 2019, during which time respondent was 17 and 18 years old. The first plan Donaldson-Myles established was for the period of January to July 2018. That plan required respondent to (1) cooperate with DCFS, which included having a legal means of support and safe housing, (2) take parenting classes, (3) attend visitation, (4) attend mental health counseling, (5) obtain a substance abuse assessment, and (6) become independent. Donaldson-Myles testified she made the appropriate referrals for respondent to access all the necessary services. Respondent received an unsatisfactory rating for the January to July 2018 plan. As to cooperation, respondent received an unsatisfactory rating because she was combative and defiant in working with DCFS. She also received an unsatisfactory rating for parenting and visitation for issues during visits with I.H. Donaldson-Myles explained she had received a report respondent got into a fight in front of I.H. with staff at her transitional living program over a curfew, which DCFS had established for I.H.'s benefit. Moreover, Donaldson-Myles received

- 3 -

reports about respondent not having food for I.H. during visits and missing the established curfew. Respondent was rated unsatisfactory for substance abuse because she did not obtain a substance abuse assessment, self-reported marijuana use, and tested positive for marijuana. However, on cross-examination, Donaldson-Myles testified she did not receive any reports indicating respondent was using marijuana during the January to July 2018 reporting period. Respondent also received an unsatisfactory rating for mental health counseling because her attendance was inconsistent and she had made little to no progress in therapy. Donaldson-Myles also noted respondent did not have consistent employment during the reporting period but did have housing as part of a transitional living program.

¶ 9    Donaldson-Myles testified the next service plan covered the period of July 2018 to January 2019. Respondent's tasks remained the same, except parenting was changed to participate in a parenting coach program and anger management counseling was added. Donaldson-Myles testified all the referrals for respondent were in place. When that service plan was graded, respondent again was rated unsatisfactory for cooperation due to her being combative and defiant. Donaldson-Myles explained respondent was combative regarding the service plan. She refused to do drug tests and to provide proof of employment. Respondent also received an unsatisfactory rating for parenting because she was not displaying or demonstrating the skills learned from parenting classes in her interactions with I.H. during visits. Donaldson-Myles noted respondent did not start the parenting coach program until November 2018. Despite completing the substance abuse assessment in October 2018, respondent was rated unsatisfactory for substance abuse because she continued to self-report marijuana usage, test positive for marijuana, and occasionally refuse to do drug drops. DCFS was concerned about respondent's marijuana use because respondent was a minor, it was illegal, and it directly

impacted respondent's ability to demonstrate positive parenting skills. However, Donaldson-Myles admitted she never received a report of respondent being impaired by marijuana during visits. Respondent also received an unsatisfactory rating for mental health counseling, which included anger management counseling, because her attendance was inconsistent. Regarding visitation, Donaldson-Myles decreased visits in May 2018 from overnights at respondent's residence to two hours once a week in Springfield. The change was made based on respondent missing curfew and not having food for I.H. during overnight visits with I.H. Overall, respondent received an unsatisfactory rating for the July 2018 to January 2019 parenting plan. After the second overall unsatisfactory rating for respondent, Donaldson-Myles requested legal screening to see if cause existed to change the goal from return home. The conclusion of the legal screening was respondent had not made significant progress for return home in any nine-month period.

¶ 10       Donaldson-Myles established a service plan for January 2019 to July 2019 but left the case in March 2019. From January 2019 to March 2019, respondent had begun to engage in services. Respondent completed the parenting coach program and was attending outpatient substance abuse treatment. Respondent was still testing positive for marijuana. Respondent was also attending her mental health counseling. Moreover, a decision had been made to increase respondent's visits. Donaldson-Myles was never close to returning I.H. to respondent's care because respondent was not prepared for visitation, was unable to demonstrate skills she learned regarding safety, and could not maintain employment. Donaldson-Myles testified respondent was stable for periods of 30 to 45 days at the most. When Donaldson-Myles left the case, it was her professional opinion respondent was not able to put I.H.'s needs ahead of her own.

¶ 11       Hampton testified she was respondent's parenting coach from September 2018 to

January 2019. She attended six visits between respondent and I.H. The visits were for two hours at the DCFS office or in the Springfield community, but Hampton only attended visitation that took place at the DCFS office. Hampton only supervised one entire two-hour visit because of a change in the time of visitation, respondent was late, or respondent decided to go somewhere in the community. The common occurrences in the six visits were the following: respondent would (1) hug I.H. upon entering, (2) talk to I.H. during the visit, (3) do I.H.'s hair, and (4) put on a movie on her cellphone. Respondent did do other activities with I.H., such as coloring and dancing. However, Hampton had to have multiple conversations with respondent about putting her cellphone away. Respondent's big issue was focusing on her cellphone and not on her child. Respondent and I.H. would engage in bonding activities for 15 to 20 minutes of the two-hour visit instead of the whole time. Hampton further testified respondent would allow I.H. to have the cellphone whenever she asked for it. Respondent also had issues with being on time and bringing food for visits. In Hampton's opinion, respondent did not make a noticeable improvement in parenting abilities by the end of the coaching period because respondent would not follow Hampton's directions. In her discharge report, Hampton rated respondent's discharge unsatisfactory and recommended respondent continue to work on putting her cellphone away during visits. Hampton did find respondent had potential to parent.

¶ 12    Respondent testified she was 21 years old and living in Belleville, Illinois, with her boyfriend, Vincent P., and their six-month old son, K.P. She had been with Vincent since July 2017. Respondent was 15 years old when she had I.H. After respondent became a ward of the court, respondent was placed in a group home with I.H. where they lived until February 2017. I.H. was placed in a traditional foster home at that time.

¶ 13    Respondent further testified working with Donaldson-Myles was "just like hell on

wheels." According to respondent, Donaldson-Myles was very rude and inconsiderate. When Donaldson-Myles was her caseworker, respondent requested a new caseworker multiple times. Respondent described the fight mentioned by Donaldson-Myles as a verbal altercation that she removed herself from by leaving with I.H. Respondent also explained the lack of food incidents occurred prior to April 2018 because, at that time, she moved into an independent living apartment. Respondent felt she made progress while Donaldson-Myles was her caseworker because she completed a parenting class, eventually did a substance abuse assessment, and started drug counseling. Respondent admitted it took her awhile to do the substance abuse assessment and start counseling because she did not want to do those tasks because she had already completed them once. Respondent also explained she had a hard time maintaining employment due to her visitation schedule, and Donaldson-Myles would not work with respondent's employment schedule. She also testified she always left her job for a better job.

¶ 14        Regarding visits, respondent explained she and I.H. did more than watch movies on respondent's cellphone and work on I.H.'s hair. She testified they often did crafts and things in the community. Additionally, I.H. asked to call relatives during visits. Respondent denied ever using marijuana in front of I.H. Additionally, respondent testified, in January 2019, she started studying criminal justice in college. She was also working nights at that time and would not hear the person, who brought I.H. for a morning visit, knocking on respondent's door. After 15 minutes, the person would leave with I.H. Respondent testified that only happened twice.

¶ 15        Overall, respondent felt she was a much better parent than she was in 2017. Respondent testified she grew up and was more receptive to the services she was being offered. Respondent admitted it was her fault she was using marijuana and not attending counseling during the period of July 2018 and January 2019. Respondent testified she no longer used

marijuana. Respondent further testified she worked for Instacart and did hair.

¶ 16     At the conclusion of the hearing, the circuit court found respondent unfit on all seven grounds asserted in the termination motion and supplemental motion. The court also found Christyen unfit.

¶ 17     On September 9, 2021, the circuit court held the best interests hearing. The State presented the testimony of Verry and Sarah E., I.H.'s foster parent. Respondent testified on her own behalf.

¶ 18     Verry testified she had never had any concerns about respondent's visits with I.H. and noted respondent definitely loves I.H. I.H. does know respondent is her mother and is bonded with her. However, Verry noted a lack of both consistency in respondent's visitation schedule and structure during visits. Verry had observed I.H. in her current foster home placement six to seven times and had observed a bond grow between I.H. and the foster parents. Verry stated the foster home was a family environment. Verry stated I.H.'s current foster home was the most stable home she had been in and I.H. has become a part of the family. In her professional opinion, I.H. should not be returned to respondent.

¶ 19     Additionally, Verry testified the best interests hearing had been continued following the unfitness finding to give respondent an opportunity to complete the things she needed to do to have I.H. returned home. Respondent was asked to provide a stable home and proof of income. However, respondent did not have suitable housing at the time of the last visit. Respondent's apartment had only one bedroom. Respondent also had been unable to provide proof of income or documentation to support her employment.

¶ 20     Sarah testified she was a full-time parent and lived with her husband and daughter. I.H. had also lived in her home for the past three and a half months. While some

sibling rivalry occurred in the beginning, Sarah's daughter and I.H. had bonded and become very close. I.H. was very affectionate with the family and enjoyed family time and her bedtime routine. Sarah felt she had a mother/daughter relationship with I.H. Sarah had observed a significant reduction in I.H.'s stress level and hypervigilance while residing in her home. I.H. had voiced concerns about being forced to move again and expressed a desire for a forever family. I.H. called Sarah "mommy," and Sarah's husband "daddy." They were willing to adopt I.H.

¶ 21    Additionally, Sarah recognized she did not have the same ethnic background as I.H. and noted it was very important to the family to support I.H.'s ethnic background and culture. Sarah and her husband were of different ethnicities and religions. They intended to find a mentor for I.H. who shared the same ethnicity. Sarah also testified she supported I.H. maintaining connections with her biological family. I.H. has a framed picture of her and respondent in her bedroom. In maintaining such connections, Sarah would do what was in I.H.'s best emotional interests with the advice of professional counselors.

¶ 22    Respondent testified DCFS had not required her to find a bigger home but she had been looking for one anyway. Respondent explained it was common sense I.H. needed her own bedroom. She had found a place but lost it to another person who made a larger deposit than respondent. When her visits were changed to monthly, respondent stopped looking for another home. Respondent also testified her caseworker stated she could not help respondent find housing if I.H. was not living with her. Without I.H. living with her, respondent did not need a larger home. Respondent further testified she had been working at Wendy's for almost two months. On the side, respondent also did hair and resold shoes. Respondent did not keep receipts for the shoe selling because she started doing that after the last court date. As to her hair

business, respondent testified she kept a receipt book but her caseworker said that was not enough proof. The caseworker wanted names and telephone numbers, but no one was willing to provide that information. Regarding her job with Instacart, respondent explained she did not receive paystubs but did show the caseworker the payments she received on the Instacart app. She made about $600 to $700 a week when she was doing Instacart. Since the unfitness finding, respondent had five or six visits with I.H. At the end of I.H.'s birthday visit, I.H. was crying when she got into the car to leave. Respondent allowed her family to come to visits because she wanted I.H. to see she has a big family that loves her.

¶ 23        I.H. calls respondent "mom" and loves spending time with K.P. Respondent testified she and I.H. had an unbreakable bond and she wants I.H. to come home. Respondent testified she could financially provide for all of I.H.'s needs, including a larger home. She only stopped looking when DCFS indicated it was no longer seeking to return I.H. home.

¶ 24        After hearing the parties' arguments, the circuit court found the termination of respondent's parental rights was in I.H.'s best interests. The court entered a written order terminating respondent's and Christyen's parental rights to I.H.

¶ 25        On September 10, 2021, respondent filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of the appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 26                                II. ANALYSIS

¶ 27        Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West

- 10 -

2018)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor child's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 28            Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010) (best-interests determination). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 29                                A. Respondent's Fitness

¶ 30            Respondent contends the circuit court erred by finding her unfit. In this case, the circuit court found respondent unfit on all of the grounds alleged in the petition. One of the bases for the circuit court's unfitness finding was section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)), which provides a parent may be declared unfit if he or she

fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoti*ng In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

> " '[T]he benchmark for measuring a parent's "progress toward the return of the child" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d

227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 31    In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)). Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844. In this case, the petition alleged three nine-month periods, but we will address the period of May 2, 2018, to February 2, 2019.

¶ 32    Donaldson-Myles was I.H.'s caseworker during that nine-month period, and she testified respondent received overall unsatisfactory ratings on the two service plans rated during that period. The January to July 2018 service plan contained tasks of (1) cooperation with DCFS, which included having a legal means of support and safe housing; (2) parenting classes; (3) visitation; (4) mental health counseling; (5) substance abuse; and (6) independence. The next service plan, which covered July 2018 to January 2019 added the task of anger management and changed the parenting task to having a parenting coach. Donaldson-Myles explained, during both service plan periods, respondent had been combative and defiant with her. Respondent would refuse to provide proof of employment and drug drops. Regarding parenting, respondent was given an unsatisfactory discharge by Hampton, the parenting coach, because respondent's cellphone was a major distraction during visits. Hampton further testified respondent did not improve in parenting skills during the coaching sessions because respondent did not listen to any of Hampton's suggestions. Additionally, respondent had issues with visitation resulting in her visits being moved from overnights to two-hour visits at the agency office or in the community

during the nine-month period. Respondent had missed a set curfew multiple times, missed multiple visits, and did not always have food for I.H. Further, respondent was inconsistent with attending mental health counseling, which included addressing anger management. While respondent did complete her substance abuse assessment during the nine-month period, respondent had positive drug drops for marijuana and self-reported marijuana use. Donaldson-Myles testified she was never close to returning I.H. while she was the caseworker. Donaldson-Myles explained respondent had not established a level of stability to parent a child or live independently. At most, respondent would be stable for a period of 30 to 45 days.

¶ 33　　　　　　Given the above evidence, the circuit court's finding respondent failed to make reasonable progress during the period of May 2, 2018, to February 2, 2019, was not against the manifest weight of the evidence.

¶ 34　　　　　　Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of respondent's failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)) during the nine-month period of May 2, 2018, to February 2, 2019, we do not address the other bases for the circuit court's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 35　　　　　　　　　　　　B. I.H.'s Best Interests

¶ 36　　　　　　Respondent also challenges the circuit court's finding it was in I.H.'s best interests to terminate her parental rights. The State disagrees and contends the court's finding was proper.

¶ 37　　　　　　During the best interests hearing, the circuit court focuses on "the child's welfare and whether termination would improve the child's future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so,

- 14 -

the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)) in the context of the child's age and developmental needs.  See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005).  Those factors include the following:  the child's physical safety and welfare; the development of the child's identity; the child's family, cultural, and religious background and ties; the child's sense of attachments, including continuity of affection for the child, the child's feelings of love, being valued, security, and familiarity, and taking into account the least disruptive placement for the child; the child's own wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the child.  705 ILCS 405/1-3(4.05) (West 2018).

¶ 38    We note a parent's unfitness to have custody of his or her child does not automatically result in the termination of the parent's legal relationship with the child.  *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002).  As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor child's best interests.  See *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228.  "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not."  *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 39    While it was undisputed respondent loved I.H. and was bonded with her, the major issue in this case was stability.  By the time of the best interests hearing, I.H. had been living apart from respondent in various foster homes for more than four years and had expressed a desire not to move again and to have a forever family.  Respondent continued to have issues

with providing stability for I.H. Despite being given time between the unfitness hearing and the best interests hearing to show she could provide a stable home for I.H., respondent failed to obtain an apartment big enough for I.H. to reside there and failed to provide proof of income. Moreover, while only residing in her current foster home for three months, I.H. had bonded with her foster family. The foster parents were willing to adopt I.H. They had already made efforts to support I.H.'s ethic background and were willing to support connections with I.H.'s birth family.

¶ 40        Accordingly, we find the circuit court's conclusion it was in I.H.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 41                          III. CONCLUSION

¶ 42        For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 43        Affirmed.